UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA DEJESUS RAMIREZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | ) Case No.: 1:14-cv-01229- JLT<br>)<br>) ORDER DIRECTING ENTRY OF JUDGMENT IN<br>) FAVOR OF DEFENDANT, CAROLYN W.<br>) COLVIN, ACTING COMMISSIONER OF SOCIAL<br>) SECURITY, AND AGAINST PLAINTIFF MARIA<br>) DEJESUS RAMIREZ<br>)<br>)<br>)<br>) |

Plaintiff asserts she is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the credibility of her subjective complaints. Because the ALJ identified clear and convincing reasons in support of the credibility decision, the administrative decision is **AFFIRMED**.

## BACKGROUND

On November 5, 2010, Plaintiff filed her applications for benefits, in which she alleged disability beginning January 2, 2001. (Doc. 11-3 at 22) The Social Security Administration denied the applications at the initial level and upon reconsideration. (*Id.*; Doc. 11-5 at 4-7, 11-16) Plaintiff requested a hearing, and testified before an ALJ on September 26, 2012. (*Id.* at 22, 41) The ALJ determined Plaintiff was not disabled under the Social Security Act, and issued an order denying benefits on October 3, 2012. (*Id.* at 19-28) Plaintiff filed a request for review of the decision with the

1

Appeals Council, which denied the request on May 22, 2014. (*Id.* at 10-12) Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A.     Relevant Medical Evidence

On March 19, 2009, Dr. Evangeline Murillo evaluated Plaintiff to develop a plan of care with the Fresno County Department of Behavioral Health. (Doc. 11-8 at 55-59)  Plaintiff reported she had suffered from "[s]evere depression since her father died." (*Id.* at 59)  She told Dr. Murillo she dreamed about her father and saw him "in her dreams" and when "newly awake." (*Id.*)  Plaintiff also said that she missed "her son who went to the Service." (*Id.*)  She reported that she had crying spells, anxious feelings, loss of appetite, and she did "not want to be around anyone." (*Id.* at 58-59)  Dr. Murillo observed that Plaintiff's cognition was normal and her thought process was organized, although her mood was depressed and her affective range was constricted. (*Id.* at 55) Dr. Murillo diagnosed Plaintiff with Major Depression Recurrent and prescribed Ambien, Seroquil, and Anafranil. (*Id.* at 55, 57)

On July 1, 2009, Plaintiff reported she "feels better" with her medication. (Doc. 11-8 at 53)  She explained that she was "not crying anymore and [had] been sleeping better and feeling more hopeful." (*Id.*)  Dr. Murillo believed Plaintiff's symptoms were improved, and found Plaintiff's thought content was normal. (*Id.*)  Dr. Murillo opined Plaintiff's mood, affective range, and insight were normal. (*Id.*)  She gave Plaintiff a Global Assessment Functioning ("GAF") score of 60.[1] (*Id.*)

---

[1] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.*

|   |   |
|---|---|
| 1 | In September 2009, Plaintiff said she was "doing well with her current meds," and wanted a |
| 2 | refill. (Doc. 11-8 at 52) Dr. Murillo observed that Plaintiff's mood continued to be normal. (*Id.*) |
| 3 | On November 23, 2009, Plaintiff reported she was "not feeling well." (Doc. 11-8 at 51) |

 In September 2009, Plaintiff said she was "doing well with her current meds," and wanted a refill. (Doc. 11-8 at 52) Dr. Murillo observed that Plaintiff's mood continued to be normal. (*Id.*)

 On November 23, 2009, Plaintiff reported she was "not feeling well." (Doc. 11-8 at 51) Plaintiff said that she and her 15-year-old daughter were being evicted because they could not pay the rent, and they had no place to go. (*Id.*) Dr. Murillo observed that Plaintiff exhibited a depressed mood, and her affective range was constricted. (*Id.*) However, Plaintiff's cognition and thought content remained normal. (*Id.*) Dr. Murillo determined Plaintiff needed additional medication "for her nerves," and Plaintiff agreed to start taking Vistaril and Luvox. (*Id.*)

 On December 3, 2009, Plaintiff had x-rays on her chest to determine whether she had chronic obstructive pulmonary disease. (Doc. 11-8 at 6) Dr. Artenian found Plaintiff's lung expansion was normal, and there was "no infiltrate or nodularity." (*Id.*) She concluded the results were negative. (*Id.*)

 In February 2010, Plaintiff had x-rays taken of her chest due to pain and a cough, which showed her lungs were clear without congestion. (Doc. 11-9 at 13) In addition, Dr. Sukhjit Chahal ordered "a CT angiogram done on [Plaintiff] which revealed a complete occlusion of the right common iliac artery." (Doc. 11-8 at 7) Dr. Chahal noted she would send Plaintiff to the radiology department "to see if they can put a stent in that artery." (*Id.*) The stent was placed on February 25, and gave "excellent resulting flow." (*Id.* at 30)

 In April 2010, Plaintiff reported she had been in a car accident, after which she stopped driving. (Doc. 11-8 at 47) Also, Plaintiff said she "had a lot of pain and became depressed with crying spells." (*Id.*) When her son was home for vacation from service, he found a place for Plaintiff and her daughter to stay. (*Id.*) Plaintiff said her current medication was helping; "she [was] not crying as much and [was] able to sleep with Ambien." (*Id.*) Dr. Murillo found Plaintiff's mood was normal, her affective range was constricted, and her insight and judgment were intact. (*Id.*) Plaintiff did not report having any side effects from her medication. (*Id.*)

 On April 19, 2010, Plaintiff had a non-invasive venous and arterial evaluation "for determining the flow characteristics through the major veins in both lower extremities." (Doc. 11-8 at 65-66) Dr. George Mednik found the spontaneous/phasic flow was normal, and there was "[n]o evidence of thrombosis, deep venous obstruction or venous insufficiency." (*Id.* at 65) However, Plaintiff had

4

"[m]ild to moderate thickening of the intimal walls with plaque and 20-409% stenosis of the right superficial femoral artery, left popliteal artery and bilateral common femoral arteries." (*Id.* at 66)

Plaintiff failed to keep an appointment in May 2010, and next visited Dr. Murillo in July 2010. (Doc. 11-8 at 45-46) Plaintiff reported she felt "anxious whenever she goes out but does not know why," and that she cried easily. (Doc. 11-9 at 45) Dr. Murillo noted Plaintiff's cognition, thought content, insight, and judgment remained normal, but Plaintiff exhibited a depressed mood and constricted affective range. (*Id.*) Dr. Murillo increased the prescription of Vistaril for Plaintiff. (*Id.*)

On November 22, 2010, Plaintiff reported her depression had increased, which she "believe[d] … could be because her dad died on a Thanksgiving day and her mother just had a stroke and [was] in the convalescent hospital and her son [was] still in Iraq and going to Afghanistan." (Doc. 11-8 at 40) Martyann Blazevich, a licensed vocational nurse, noted that Plaintiff did not have any side effects from medication. (*Id.* at 39) Similarly, Dr. Murillo noted Plaintiff did not report any side effects. (*Id.* at 40) Dr. Murillo believed Plaintiff's mood, affective range, insight, and judgment were normal. (*Id.*)

On June 1, 2011, Plaintiff reported she was feeling more depressed, and Dr. Murillo decided to change her prescription from Luvox to Cymbalta. (Doc. 11-9 at 28) Dr. Murillo observed that Plaintiff had a depressed mood, and gave her a GAF score of 55. (*Id.*)

Dr. Tomas Rios conducted a comprehensive internal medicine evaluation on June 6, 2011. (Doc. 11-8 at 77) Plaintiff reported she had diabetes, pain in her right leg, and heart problems. (*Id.*) She said she took "over 300 units per day" of insulin, and "her blood sugar ha[d] been fluctuating from the low 40s to high 200s." (*Id.*) Plaintiff said she had "numbness and pain to both feet and to her fingertips," as well as "pain on the right leg and right knee." (*Id.*) She described her heart pain as "sharp and stabbing" at times, and at other times it was a "pressure-like sensation." (*Id.*) Plaintiff told Dr. Rios that she no longer drove, but she was independent in other activities of daily living. (*Id.* at 78)

Dr. Rios observed that Plaintiff was able to "ambulate[] without any significant gait alteration." (Doc. 11-8 at 78) Upon examination, Dr. Rios determined Plaintiff had "some tenderness along the medial compartment of the right knee." (*Id.* at 80) He determined Plaintiff's "[m]otor strength [was] preserved at 5/5 in the upper and lower extremities with normal muscle bulk and tone." (*Id.*) Dr. Rios found "no pulmonary or dependent edema," and "no gallop rhythm" in Plaintiff's heart. (*Id.*) He

5

concluded Plaintiff was able to stand and walk up to six hours and sit up to six hours. (*Id.* at 81) Dr. Rios opined Plaintiff was able to lift and carry "20 pounds occasionally and 10 pounds frequently, limited on account of her history of chest pain with exertion, compounded by underlying degenerative joint disease of the weight bearing joints, especially on the right knee." (*Id.*) Further, he believed Plaintiff was "capable of performing occasional climbing, balancing, stooping, kneeling, crouching and crawling;" and "frequent reaching, handling, feeling and fingering." (*Id.*) Finally, Dr. Rios opined Plaintiff "should be precluded from working around chemicals, dust, fumes, and gases on account of her history of reactive airway disease." (*Id.*)

Dr. Mary Lewis performed a comprehensive psychiatric evaluation on June 10, 2011. (Doc. 11-8 at 82) Dr. Lewis noted that Plaintiff said: "I've been depressed since 2007. I'm just all shaky and I don't think I can work around people like this. No, I don't have problems eating and sleeping and I'm not suicidal. Yeah, I function and do things with my friends. I'm just depressed." (*Id.*) Plaintiff reported that in a typical day, she watched television, cleaned, ate, washed dishes, and swept. (*Id.* at 86) Plaintiff reported she was last employed by the Department of Children and Family Services, "where she worked as a social worker … from 1999 through 2001." (*Id.* at 83) Plaintiff said she stopped working after she was "bumped by other employees who had degrees and more seniority." (*Id.*) According to Dr. Lewis, Plaintiff reported "she was not willing to work in any job position, [was] not actively seeking employment and [was] not involved in a retraining program." (*Id.*)

Dr. Lewis found Plaintiff's "[s]tream of mental activity [was] within normal limits," and her thoughts were "linear, logical, coherent, and goal directed." (Doc. 11-8 at 84) She determined Plaintiff was "not significantly impaired" with her "global ability to act purposefully, to think rationally, and to deal effectively with her environment." (*Id.*) Further, Dr. Lewis found Plaintiff's recent memory recall, attention, and concentration were "satisfactory," based upon Plaintiff's "ability to successfully recall … three items after five minutes," complete a three-step command, and "successfully count by 2s to 20 and back to zero." (*Id.* at 85-86) Dr. Lewis gave Plaintiff a GAF score of 64[2] and observed:

---

[2] GAF score between 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV* at 34.

> The reported symptoms of depression appear to be inconsistent and the presentations of symptoms are not typical of a major mental disorder. Despite the claimant's reported symptoms and history, she does not appear to be suffering from a major mental disorder at this time. From a mental health perspective, the claimant appears to be able to function adequately.

(*Id.*) Dr. Lewis concluded Plaintiff was "not significantly impaired" with her ability to understand and remember either very short and simple instructions or detailed instructions, sustain an ordinary routine, interact with co-workers, maintain attention and concentration, deal with changes, and "complete a normal workday and workweek without interruptions at a consistent pace." (*Id.* at 87) Further, Dr. Lewis opined "[t]he likelihood of the claimant emotionally deteriorating in a work environment [was] minimal." (*Id.*)

Dr. Deborah Hartley completed a psychiatric review technique form on June 29, 2011. (Doc. 11-8 at 88-101) Dr. Hartley observed that treatment notes indicated Plaintiff had a "normal mood, affect, insight/judgment, [thought content], orientation, speech, cognition as well as organized [thought process] and average intelligence." (*Id.* at 100) In addition, she noted Plaintiff's memory, attention, and concentration were intact during the consultative examination. (*Id.*) Further, Dr. Hartley noted Plaintiff reported "no mental barriers to personal care, preparing simple meals, performing housework, shopping, [and] managing money," although she did "note[] difficulty w/ preparing complicated meals secondary to her poor memory, going outside and following instructions." (*Id.*) Dr. Hartley found Plaintiff had a mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (*Id.* at 98) Accordingly, Dr. Hartley concluded Plaintiff's mental impairments were "not severe." (*Id.* at 100)

On July 13, 2011, Dr. Kenneth Wainner completed a physical residual functional capacity assessment. (Doc. 11-8 at 102-09) Dr. Wainner opined Plaintiff was able to lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk about six hours in an eight-hour day; and sit about six hours in an eight hour day. (*Id.* at 103) He explained these findings were based upon the fact that Plaintiff had "no ischemic changes, palpable distal pulses and strength [was] 5/5 globally." (*Id.*) In addition, Plaintiff had a normal gait, and "no physical barriers to preparing … simple meals, performing housework, driving, and shopping." (*Id.*) Though Plaintiff reported "difficulty preparing

7

complicated meals secondary to leg pain, lifting, squatting, standing and walking," Dr. Wainner found these limitations were not supported in the medical record, and he concluded that Plaintiff did not have any postural limitations. (*Id.* at 104)  Further, Dr. Wainner determined Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. (*Id.* at 105-06)

On September 29, 2011, Plaintiff had a comprehensive assessment with Fresno County Department of Behavioral Health, where she was evaluated by Carol Grainger, LMFT. (Doc. 11-9 at 23-27)  Plaintiff reported "she began hearing voices just before she goes to bed," and that she had nightmares. (*Id.* at 23, 25)  Ms. Grainger observed that Plaintiff was sad, tense, and fearful. (*Id.* at 25)  Ms. Grainger opined Plaintiff's thought flow was logical, rational, and coherent; and her thought content was within normal limits. (*Id.* at 25)  Ms. Grainger recommended Plaintiff participate in either group or individual therapy, which Plaintiff said she may be interested in the future. (*Id.* at 27)

Dr. Garcia reviewed the record on October 12, 2011, and noted Plaintiff's mental condition had improved since an ALJ issued a decision on a prior application in 2009. (Doc. 11-9 at 6)  Dr. Garcia affirmed the opinion of Dr. Hartley that Plaintiff's reported mental impairments were not severe. (*Id.*)

On January 31, 2012, Dr. Mark Chofla covered for Dr. Murillo during Plaintiff's appointment. (Doc. 11-9 at 17)  Dr. Chofla noted that Plaintiff's thought process was organized and she reported her insight and judgment were "both relatively improved along with impulse control." (*Id.*)  In addition, Plaintiff told Dr. Chofla that her mood was "better" and she was "less depressed." (*Id.*)

In March 2012, Plaintiff reported Vistari was not working for her anxiety, and agreed to try Buspar. (Doc. 11-9 at 14)  Plaintiff reported she did not have any side effects from her medication, and Dr. Murillo opined her condition was "improved." (*Id.*)  According to Dr. Murillo, Plaintiff's cognition was "grossly intact," her thought process was organized; and her mood was better because she was less depressed, although she suffered from anxiety. (*Id.*)

**B.     Administrative Hearing Testimony**

Plaintiff testified that she last worked from as a "social worker aide for CPS." (Doc. 11-3 at 46)  She reported she was "hired as extra help," and was laid off in 2001. (*Id.*)  Plaintiff said she tried looking for other work, "but it was very difficult" due to her "lack of experience in other fields." (*Id.*)  Plaintiff stated that she last worked for work in "about 2001," and she had not pursued any training or

additional schooling.  (*Id.*)

She reported that she had diabetes, anemia, pain, depression, and anxiety, which would cause her to have problems working. (Doc. 11-3 at 53, 57, 61)  Plaintiff said, "I just want to be locked in a room by myself. I don't care if I have company or not.  I don't like to be around people, even though I used to be a people person." (*Id.* at 58)  Further, Plaintiff testified that she had chronic obstructive pulmonary disease, which caused a shortness of breath when she was upon and about for more than five minutes. (*Id.* at 59)

Plaintiff reported her diabetes was not controlled, and her blood sugar levels ranged from a low of 40 "[t]o over 500." (Doc. 11-3 at 53)  She said her medication was changed several times over the past two years, but had not helped control her levels. (*Id.*)  She stated her blood sugar was around 40 about once a week, which caused "cold sweats, seeing yellow spots, terrible tremors," and nausea. (*Id.* at 53-54)  Plaintiff testified that her sugar levels got to the "400 to 500 range" about once a month. (*Id.* at 54)  In addition, she said she had an "insulin reaction" "about three days of [a] week," and it took approximately thirty minutes for her to get the levels regulated. (*Id.*)  Further, Plaintiff said she "constantly" felt fatigued from her diabetes. (*Id.* at 56-57)

She said she received "regular treatment" from her doctors, including seeing a doctor every month and a psychiatrist "every two months." (Doc. 11-3 at 47)  She reported she was taking thirteen medications, including inhalers." (*Id.*)  Plaintiff testified that she had many side effects from the medicine, including nausea, dizziness, trembling in fingers, double vision, and diarrhea. (*Id.* at 47-48)  Plaintiff said these side effects "usually [lasted] all day," and she was "in the bathroom a lot." (*Id.* at 48)  She explained that she ate a light breakfast, and then would "lay down for a couple hours because of [her] dizziness and double vision." (*Id.*)

According to Plaintiff, she stopped visiting friends and family because she started getting "a lot of anxiety" that caused her to shake a sweat when she was "out in the open with other people." (Doc. 11-3 at 49)  She said she no longer drove and would "get a ride" when she needed transportation. (*Id.* at 45)  Plaintiff reported it was "difficult for [her] to walk to the bus stop," which was located "[a]bout a block and a half" from her house. (*Id.*)  Plaintiff stated she also lost interest in hobbies, such as playing computer games. (*Id.* at 50)

Further, Plaintiff testified that she had "severe depression," which she attributed to her son being stationed in Afghanistan "for a couple of years." (Doc. 11-3 at 63) Plaintiff said she also felt "pressure" because her father, sister, best friend, and nephew all died within a five-month period in 2006 to 2007. (*Id.* at 64) Plaintiff reported she was tearful and cried "[a]lmost every day." (*Id.* at 65) She reported she was also depressed due to being overweight, though she reported she had recently lost twenty pounds. (*Id.*)

She also reported an inability to focus, and that she had a "loss of concentration." (Doc. 11-3 at 51) Plaintiff explained she did not think she was able to focus on a two-hour movie, saying: "I find myself watching but not even knowing what I'm seeing." (*Id.*)

## C.     The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial activity after the alleged disability date of March 23, 2011. (Doc. 11-3 at 25) Second, the ALJ found Plaintiff "has the following severe impairments: obesity, diabetes mellitus; depression; anxiety; chronic obstructive pulmonary disease (COPD); and claudication of the right lower extremity, status post stent placement." (*Id.*) These impairments did not meet or medically equal a listed impairment. (*Id.* at 25-27) Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.967(b). Further, she is capable of work that involves occasionally balancing, stooping, crouching, crawling, and kneeling; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently reaching, handling, feeling, and fingering; no public contact; and no tandem tasks with coworkers. Further, she should avoid exposure to dust, fumes, gases, and odors.

(*Id.* at 27) With this residual functional capacity, the ALJ found Plaintiff was unable to perform any past relevant work, but retained the ability to perform "jobs that exist in significant numbers in the national economy." (*Id.* at 33) Accordingly, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. (*Id.* at 34)

## DISCUSSION AND ANALYSIS

Plaintiff's sole argument in her appeal is that the ALJ failed to properly evaluate the credibility of her subjective complaints. (*See generally* Doc. 13 at 4-11) When evaluating a claimant's credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment

10

"which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Next, if there is no evidence of malingering, the ALJ must make specific findings as to the claimant's credibility. *Id.* at 1036.

An adverse credibility determination must be based on clear and convincing evidence where there is no affirmative evidence of malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Factors that may be considered include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct; (3) the claimant's daily activities, (4) treatment received (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002). To support a credibility determination, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).

Here, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 11-3 at 28) However, the ALJ found her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible…" (*Id.*) To support these conclusions, the ALJ considered Plaintiff's gaps in the medical record, objective findings in the record, Plaintiff's work history, and inconsistent statements. (*Id.* at 28-31)

**A.     Failure to seek treatment and gaps in treatment**

The Ninth Circuit has determined a claimant's "failure to seek treatment" supports an adverse credibility determination. *Fair*, 885 F.2d at 603. Similarly, an ALJ may determine a claimant's statements are "less credible if the level or frequency of treatment is inconsistent with the level of complaints." SSR 96-7p, 1996 SSR LEXIS 4, at *21. Thus, minimal treatment may suggest a lower level of pain and functional limitations than a claimant alleges. *See Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995); *see also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("unexplained, or inadequately explained, failure to seek treatment . . . can cast doubt on the sincerity of the claimant's

pain testimony"). When rejecting testimony for gaps in treatment, an ALJ "must not draw inferences about an individual's symptoms and their functional effects . . . without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek treatment." SSR 96-7p, 1996 SSR LEXIS 4, at *22. For example, the Ninth Circuit has held gaps in treatment do not constitute a clear and convincing reason for discounting credibility if the claimant lacked the financial ability to pay for treatment. *Orn*, 495 F.3d at 638 (9th Cir. 2007).

Here, the ALJ observed that there were gaps in the medical record for Plaintiff's mental health treatment, and that Plaintiff did not seek any treatment between November 2010 and June 2011. (Doc. 11-3 at 30) Because Plaintiff did not explain the delay in seeking treatment, the ALJ properly considered the gaps in treatment as part of the credibility determination. *See Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005) (the ALJ properly considered a "three to four month" gap in treatment in discrediting claimant's testimony regarding her levels of pain); *see also Lisell v. Colvin,* 2015 U.S. Dist. LEXIS 141983 at *19 (C.D. Cal. Oct. 16, 2015) (finding a claimant's delay in seeking treatment for about six months was "a clear and convincing ground" supporting the ALJ's adverse credibility finding).

**B.     Plaintiff's employment history and willingness to work**

The ALJ noted Plaintiff "admitted that she did not stop working due to disabling symptoms. Rather, she stopped working because she was laid off from work in 2001." (Doc. 11-3 at 31) Further, the ALJ noted Plaintiff "admitted that she was not willing to work in any job position." (*Id.*, citing Doc. 11-8 at 83) The ALJ concluded, "contrary to her allegations that she is unable to work due to her symptoms, it appears the claimant is simply unwilling or unmotivated to work." (*Id.*) Plaintiff contends the ALJ erred in considering her work history, because she "does not allege disability form [sic] 2001, but instead from 2009." (Doc. 14 at 9)

The Ninth Circuit has determined an ALJ may consider a claimant's poor employment history as part of a credibility determination. *Thomas*, 278 F.3d at 959; *see also Drouin v. Sullivan,* 966 F.2d 1255, 1259 (9th Cir. 1992) (the ALJ properly considered that the plaintiff stopped working for reasons other than her alleged pain). In *Thomas*, the ALJ found *Thomas*, 278 F.3d at 959. In *Thomas*, the ALJ

found the claimant "show[ed] little propensity to work in her lifetime" given her "extremely poor work history." *Id.*, 278 F.3d at 959. The Court observed the claimant's "work history was spotty, at best, with years of unemployment between jobs, even before she claimed disability in June of 1993." *Id.* Accordingly, the Court found her poor history was a "specific, clear and convincing reason[]' for discounting her pain testimony. *Id.*

Similarly, here, the ALJ noted that Plaintiff stopped working long before her claimed disability, and that she had a poor employment history. (Doc. 11-3 at 31)  Further, Plaintiff told Dr. Lewis that "she was not willing to work in any job position." (*Id.*; *see also* Doc. 11-8 at 32)  Because Plaintiff stopped working for reasons other than her impairments and admitted that she was not willing to work, her employment history and lack of motivation support the adverse credibility determination.

**C.     Conflicts with the medical record**

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  The Ninth Circuit explained that "testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins*, 261 F.3d at 857. Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a simple statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination").  Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ "must state which . . . testimony is not credible and what evidence suggests the complaints are not credible").

Here, the ALJ determined that Plaintiff's "allegations of disabling symptoms are not consistent with the objective medical evidence of record." (Doc. 11-3 at 28)  For example, the ALJ noted that despite Plaintiff's testimony concerning the side effects of her medication, the treatment notes "do not reflect that the claimant reported the level of disabling symptoms of side effects from medication." (*Id.* at 29)  Further, the ALJ noted that Plaintiff did not exhibit "disabling symptoms or limitations" at the consultative examination with Dr. Rios.  (*Id.*)  Rather, Dr. Rios found that despite the fact that Plaintiff "had crepitation in her knees and some tenderness along the medial compartment of the right knee," she had a normal gait and did not require an assistive device for ambulation.  (*Id.*)

The ALJ also found the medical record related to Plaintiff's mental impairments conflicted with her testimony. (Doc. 11-3 at 29-30)  The ALJ noted that Plaintiff's "thought process and stream of mental activity was normal," and "[h]er judgment and abstract thinking were within normal limits." (*Id.* at 30)  In addition, despite Plaintiff's testimony that she was unable to concentrate, at the examination she "was able to recall three objects immediately after five minutes" and "successfully completed a three-step command." (*Id.*)  Moreover, the ALJ noted: "Dr. Lewis stated that the claimant's reported symptoms appear to be inconsistent, and the presentations of symptoms are not typical of a major mental disorder.  She stated that the claimant appears to be able to function and does not have a major mental disorder." (*Id.*)

Accordingly, the ALJ sufficiently identified evidence in the medical record that undermined the credibility of Plaintiff's complaints related to both her physical and mental impairments.  Thus, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Dodrill*, 12 F.3d at 918.

**CONCLUSION AND ORDER**

For the reasons set for above, the Court finds the ALJ identified clear and convincing reasons to find Plaintiff's subjective complaints lacked credibility that were "sufficiently specific to permit the court to conclude the ALJ did not arbitrarily discredit [the] claimant's testimony." *Thomas*, 278 F.3d at 958.  Because the ALJ applied the proper legal standards and set forth clear and convincing reasons to support the adverse credibility determination, the ALJ's determination that Plaintiff is not disabled must be upheld by the Court.  *Sanchez*, 812 F.2d at 510.

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and against Plaintiff Maria Dejesus Ramirez.

IT IS SO ORDERED.

Dated:   **December 9, 2015**          **/s/ Jennifer L. Thurston**
                                       UNITED STATES MAGISTRATE JUDGE